Estate of Samuel S. Denton, deceased, The First National Bank & Trust Company of Ridgefield, Administrator v. Commissioner.
Estate of Samuel S. Denton, deceased v. Commissioner
Docket No. 26591.
United States Tax Court
1952 Tax Ct. Memo LEXIS 122; 11 T.C.M. (CCH) 802; T.C.M. (RIA) 52239; July 31, 1952
*122 Edward E. Hoenig, Esq., for the petitioner. Graham Loving, Jr., Esq., for the respondent. TURNER
Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined a deficiency of $10,491.69 in the income tax of Samuel S. Denton, deceased, for the period January 1 to December 6, 1944. The only issue for decision is whether the respondent erred in disallowing a deduction of $16,486.80 taken as bad debts. Findings of Fact A portion of the facts were stipulated and are found accordingly. On November 27, 1944, Samuel S. Denton, a resident of Ridgefield, Connecticut, was adjudged incompetent and The First National Bank & Trust Company of Ridgefield was appointed conservator of his estate. Thereafter, on December 6, 1944, Denton died and the bank was appointed administrator of his estate. The return for the period involved herein was filed on September 17, 1945, with the collector of internal revenue for Connecticut. For more than twenty years prior to his death Denton was engaged in "the business of a private banker" in Ridgefield. In the conduct of such business he made loans and advances on notes, mortgages, open accounts and other evidences *123 of indebtedness and from such business he realized income. Prior to and during 1940, Raymond M. Keeler of Ridgefield was engaged in the contracting business doing road and sewer work, excavation and masonry work. During the latter part of 1940 he was adjudicated a bankrupt and this terminated the contracting business theretofore carried on by him. Since the contracting business was the only type of business he knew, Keeler made attempts to get back into it. Early in 1941 he approached Denton for assistance. Although he had known Denton for some time, he had never had any business dealings with him. Denton agreed to assist him and in the early part of 1941 he resumed the contracting business, thereafter doing business as Keeler Contracting Company. Pursuant to his agreement, Denton purchased certain equipment for Keeler's use, leased him a garage for use as a storage room and advanced money for payroll and other operating purposes. In addition, during 1941 and 1942, Denton, from a gasoline station operated by him, supplied Keeler a considerable portion of the gasoline used by him. Denton also operated a repair shop at which repairs to the equipment were made. From time to time *124 Keeler made payments to Denton. About February 28, 1942, Denton and Keeler had several discussions about the equipment and the indebtedness owing by Keeler to Denton on account of the latter's advances and outlays to and on behalf of Keeler and it was agreed that Denton would sell the equipment to Keeler. Accordingly, on February 28, 1942, Denton and Keeler executed a conditional bill of sale of the equipment to Keeler for $11,335.89. In addition to the price of the machinery, that amount also included what they agreed was then otherwise owing by Keeler to Denton because of advances and outlays to and for Keeler. The amount of the conditional bill of sale, $11,335.89, was arrived at as follows: Advances for Equipment
$ 2,472.57
Advances for Expenses and Payroll
4-22-41 - 2-28-42: Gas and Oil
$ 2,876.93
Rent
116.00
Payroll and Other Ex-
penses
38,214.92
41,207.85
43,680.42
Less: Repayments - 4-5-41 - 2-28-42
32,555.79
11,124.63
Unidentified
211.26
Amount of Conditional Bill of Sale
$11,335.89
The conditional bill of sale provided that the $11,335.89 was to be paid to Denton at the rate of $150 per month for any three months *125 during any one year and $200 per month for the remaining nine months of said year until the sum was fully paid, the first payment to be made April 1, 1942, together with interest at the rate of six per cent per annum, computed monthly on unpaid balances and when the sum was fully paid the equipment should become the property of Keeler and he should be entitled to a bill of sale thereof on demand, but until the sum was fully paid title to the equipment was to remain in Denton. Provision was made for repossession of the equipment by Denton, his representatives or assigns, with or without legal process, in event Keeler failed to make any of the payments as stated. In event of repossession all previous payments were to be considered as compensation for the use of the equipment and were to be forfeited by Keeler. On some date, whether before or after February 28, 1942, is not disclosed. Denton purchased a gasoline shovel for Keeler at a cost of $3,500. This shovel was not a part of the equipment involved in the conditional bill of sale of February 28, 1942. Subsequent to February 28, 1942, and until about August 11, 1944, Denton made advances on open account to Keeler and the latter *126 from time to time made payments to Denton. On one occasion in the early part of 1944, Keeler approached Denton for an advance to meet a need with respect to some contracting work Keeler was then doing. At first Denton declined, stating that he was through making advances. However, when informed by Keeler that without the advance Keeler would have to turn back to him the equipment covered by the conditional bill of sale and then asked by Keeler where the equipment was to be put, Denton made the requested advance. Without the advance Keeler could not have continued with the work he was then doing. Thereafter Keeler obtained further advances from Denton until during August 1944, when he decided that Denton's mental condition was such that he was not capable of transacting business and for that reason he would seek no further advances from Denton. From March 7, 1942, to August 11, 1944, Denton made advances totaling $18,881.58 to Keeler on open account. During the same period Keeler made payments to Denton totaling $7,880.67. At August 11, 1944, the balance owing by Keeler to Denton on the conditional bill of sale dated February 28, 1942, and advances made after that date was $22,336.80. *127 If Denton, in August 1944, had demanded immediate payment in full of all the indebtedness then owing to him by Keeler, and had taken steps to collect the money owing, Keeler would have been forced to close his business, and his business and assets would not have produced a sufficient amount in liquidation to pay the amount owing to Denton. When Keeler stopped obtaining advances from Denton he had an accumulation of accounts receivable from which he made collections. With receipts from that source and earnings from current operations he continued business without assistance and without interruption. In the fall of 1945 he and Larry L. Aldrich formed a corporation known as Keeler Contracting Company, Inc., which was organized to, and did, take over and carry on the contracting business theretofore conducted by Keeler. Aldrich acquired 51 per cent of the stock in the corporation, for which he paid the corporation $8,000. For his stock in the corporation, Keeler was to transfer to it his equipment and business. Shortly after Denton's death, the petitioner herein asked Keeler to come in and thereafter from time to time until Keeler Contracting Company, Inc., was formed, had discussions *128 with him about his indebtedness to Denton. However, at no time did the petitioner ever repossess the equipment covered by the conditional bill of sale and at no time prior to the formation of the corporation did Keeler otherwise lose possession of it. The petitioner at the end of 1944 or the beginning of 1945 employed an accounting firm, of which Charles M. Hecht, a certified public accountant, was a member, to make an examination of Denton's affairs, to determine the amount of property the petitioner was responsible for as conservator and as administrator and to prepare an income tax return for Denton for 1944. During the course of his examination of Denton's records, and at the request of the petitioner, Hecht examined Keeler's 1944 income tax return, that portion of Keeler's books and records which Keeler submitted, and the tax and assessment records of the town of Ridgefield for the purpose of ascertaining the collectibility of the indebtedness then owing by Keeler to Denton's estate. Hecht filed his report under date of November 15, 1945. He concluded that at the time of Denton's death approximately $375,000 was owing to him on a great number of loans and mortgages, that of *129 such amount a total of $25,235.46 was owing by Keeler on the conditional bill of sale and on open account and that of the $25,235.46 so concluded to be owing by Keeler not more than $8,748.66 was collectible. In negotiations or conversations prior to or about October 1, 1945, between Keeler and petitioner respecting Keeler's indebtedness to Denton's estate, an agreement was reached, subject to court approval, whereby Keeler would pay and the petitioner would accept $8,000 in full settlement of the indebtedness. On October 1, 1945, the petitioner made application to the Court of Probate for the District of Ridgefield, in which Denton's estate was being administered, for authorization to compromise for $8,000 the estate's claim against Keeler. The application recited that the claim was for $25,235.46, composed of $11,335.89 owing on the conditional sales agreement of February 28, 1942, $1,881.57 owing as interest thereon to December 6, 1944, the date of Denton's death, and $12,018 owing on open account at the time of Denton's death. The application also recited that Keeler had in his possession by agreement with Denton, but without a conditional sales agreement, a gasoline shovel *130 and that upon the court's entry of an order authorizing the proposed compromise, a bill of sale would be executed by petitioner to Keeler conveying full title to the shovel. On October 16, 1945, the court authorized the compromise as requested. On or about October 10, 1945, the appraisers appointed for Denton's estate by the aforementioned court valued the equipment covered by the conditional bill of sale at $5,850 and valued the gasoline shovel at $3,500, or a total of $9,350. Following the court's authorization of the compromise, the $8,000 paid by Aldrich for stock in Keeler Contracting Company, Inc., was used in payment of the compromise settlement of Keeler's indebtedness to Denton's estate and the equipment covered by the conditional sales agreement of February 28, 1942, and the gasoline shovel were turned over to the corporation. Nowhere in the books of Denton does any entry writing off bad debts in the amount of $16,486.60 appear. In the income tax return filed on September 17, 1945, by petitioner for Denton for the period January 1, 1944 to December 6, 1944, a deduction was taken for bad debts in the amount of $16,486.80 with respect to Keeler's indebtedness to Denton. *131 The respondent disallowed the deduction with the following explanation: "It has been determined that the deduction on your return of the amount of $16,486.80, as a bad debt, on account of alleged indebtedness of Raymond M. Keeler, is not allowable under the provisions of section 23 (k) (1) of the Internal Revenue Code." Opinion Under section 23 (k) of the Internal Revenue Code, [1] it is provided that deductions shall be allowed for "debts which become worthless within the taxable year" and that the Commissioner "when satisfied that a debt is recoverable only in part * * * may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." *132 As to the $16,486.80 claimed as bad debts by the petitioner on its return, there are several points of difference between the parties. The petitioner argues that there were two separate debts, one of $11,335.89 evidenced by the conditional sales agreement dated February 28, 1942, and the other of $11,000.91, representing the balance due on an open account. As to the former, the claim is that a deduction is allowable to the extent of the excess of $11,335.89 over $5,850, the value attributed to the machinery and equipment covered by the conditional sales agreement. As to the $11,000.91, the claim is that the indebtedness was wholly worthless in 1944, and therefore, deductible in full. Respondent argues, first, that the petitioner has not shown the amount of the indebtedness for which a bad debt deduction would be allowable, if it became worthless, or that any part of such indebtedness, whatever the amount, was worthless in the taxable year, and second, that the indebtedness was one debt, not two, and even if it should be concluded on the record here that the debt was partially worthless in the taxable year, there is still no allowable deduction since within the taxable year no amount *133 was charged off as worthless, as the statute requires. We agree with the respondent that the amount of the indebtedness for which a bad debt deduction might be allowable if it became worthless has not been shown, in that the $16,486.80, in so far as the proof of record is concerned, may well and probably does include some income items which Denton, a cash basis taxpayer, did not report as income in his prior returns. [2] We are furthermore of the opinion that it makes no difference whether it be said that there was one debt equal to the entire balance owing by Keeler in the amount of $22,336.80, or whether it be said that there were two debts, one of $11,335.89 and another of $11,000.91, the reason being that the proof, even when viewed most favorably for petitioner, does not justify or support a conclusion of worthlessness of either amount. In that connection, petitioner would have us take into account only the value of the machinery and equipment securing the conditional sales obligation, but aside from that and aside from the gasoline shovel for which Denton paid $3,500, the status of which as between Denton and Keeler is not clear, the proof shows that Keeler, from and after the *134 first of August 1944, did have accounts receivable of value and that on the basis of those accounts receivable and work in progress he was able to maintain and conduct a going business after declining further advancements from Denton, and in determining the deduction, if any, to which petitioner may have been or was entitled, the receivables and such going concern value as Keeler's business may have had may not be ignored. We do not agree with respondent, however, that the proof fails to show that the indebtedness was "recoverable only in part." Keeler testified that he was not solvent and that he would have had to close his business and could not have paid the indebtedness in full if he had been pressed for payment in 1944; and although he did manage, on his own, to keep *135 his business going on through 1944 and into the fall of 1945, and after reorganization in 1945 had continued in operation up to the time of trial herein, it is our opinion that the evidence when considered in its entirety does indicate and show that the debt was worthless in some amount during the taxable year. The only prerequisite to the deduction of a wholly worthless debt under section 23 (k), as amended by the Revenue Act of 1942, and as it now exists, is that the debt must have become worthless in the taxable year. In the case of a partially worthless debt, however, the statute is otherwise. There the deduction is limited to an amount "not in excess of the part charged off within the taxable year." That does not mean that a taxpayer failing to make a partial charge-off does so at the peril of losing forever his right to deduct at some time that part which has become worthless in the taxable year. He may, if he chooses, pass over the partial worthlessness of the debt and charge it off in a later year, or may let the whole matter remain and take a deduction for the debt in full in a later year, if in such later year the debt becomes wholly worthless. E. Richard Meinig Co., 9 T.C. 976, *136 and Moock Electric Supply Co., 41 B.T.A. 1209. Compare Estate of Harris Fahnestock, 2 T.C. 756, promulgated September 27, 1943, during that interval between the enactment of the Revenue Act of 1942 and the enactment of the Revenue Act of 1943, when there was no requirement that partial worthlessness of a debt be charged off as a prerequisite to deduction. It has been stipulated that there was no actual charge-off of the $16,486.80 on Denton's books, but, by way of avoidance the petitioner argues in effect that literal compliance of the statute was impossible, the circumstances being as they were, and that what was done was adequate compliance with the statutory requirements. The amount of the deduction claimed represented the difference between the balance shown on Denton's books as the amount due from Keeler and $5,850, representing a value attributed to the machinery and equipment covered by the conditional sales agreement. The $5,850 was the value shown for the said machinery and equipment in an appraisal report filed by the appraisers under date of October 10, 1945. Except and unless the date was to be considered significant, there was nothing in the *137 report to indicate whether the appraisal was intended as an appraisal of present value or an appraisal in retrospect. Regardless of the date of the report, however, the amount which was to be reported by the appraisers must have been known or anticipated as early as September 14, 1945, since that was the date the return for the period involved herein was verified. The return was filed three days later. In any event and whatever the intent, the amount of the deduction claimed was merely a balancing of the figure arrived at as the value of the said machinery and equipment as of an unknown date against the amount appearing on Denton's books as due from Keeler, and there is no indication that any regard was given to the state of Keeler's business and other assets as they existed during or at the end of the taxable period. In truth, the contrary appears to have been the case, since Keeler did have work in progress and valuable accounts receivable, which enabled him to continue to operate on through 1944 and into the fall of 1945 without outside financial help. As we read the evidence, there was not only no charge-off in 1944 of any amount as a partially worthless debt, but further, there *138 was no ascertainment in 1944 of any part of the debt as worthless, and when in 1945, partial worthlessness was determined and the claim of deduction therefor was made in filing the 1944 return, the determination and ascertainment of such partial worthlessness was made on the basis of facts as they existed in 1945 and not during or at the end of the taxable period. Hamlen v. Welch, 116 Fed. (2d) 419, and other comparable cases cited and relied on by petitioner are not this case and are distinguishable. Neither is this a case where petitioner kept no regular books of account, as in Cammack v. United States, 113 Fed. (2d) 547. The proposition that deductions are matters of legislative grace and that taxpayers seeking deductions must meet the requirements established by Congress is too well settled to require discussion. With respect to the deduction of worthless or partially worthless debts, the statute is explicit and plain. Congress, for its own reasons, has seen fit to limit the deduction in the case of a partially worthless debt to "an amount not in excess of the part charged off within the taxable year," and the cases are clear in holding that a taxpayer *139 seeking the deduction of a partially worthless debt must satisfy the conditions therefor. In re Lewis B. Hoffman, 87 Fed. (2d) 200, affirming 16 Fed. Supp. 391; International Proprietaries, Inc., 18 T.C. 133, promulgated April 28, 1952; and Alice G. K. Kleberg, 43 B.T.A. 277, see page 296. The statute contains no provision which would permit a taxpayer retroactively to determine the partial worthlessness of a debt, ascertain the amount thereof and relate it back to a prior year. The statutory requirements for the deduction of any portion of a partially worthless debt prior to the year in which it becomes worthless must be met, or the taxpayer must await a later year, or the year in which the debt becomes wholly uncollectible. See E. Richard Meinig Co., supra, and Moock Electric Supply Co., supra.The petitioner here has not met the conditions prescribed by Congress for the deduction of the indebtedness in question to the extent of its partial worthlessness in the taxable period before us, and must be left to its deduction therefor in the following year when the debt was finally settled and closed out. *140 Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *↩
2. On the record before us we are unable to say that the charges against Keeler, here in question, did not include a margin of profit to Denton on gasoline furnished to Keeler or on the work done in Denton's repair shop and if so that such profit was ever reported by Denton as income. The record may also be open to a similar query as to rent on the storage garage and possibly as to some items of interest.↩